**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

**In re:**

**EDWARD BRIAN EVANS,**                          **Chapter 7**

     **Debtor.**                                            **Case No. 14-70570**


**BRANCH BANKING & TRUST CO.,**

     **Plaintiff,**

**v.**
                                   **Adv. P. No. 14-07039**

**EDWARD BRIAN EVANS,**

     **Defendant.**

**JUDY A. ROBBINS,**
**UNITED STATES TRUSTEE**
**FOR REGION FOUR,**

     **Plaintiff,**

**v.**
                                   **Adv. P. No. 14-07040**

**EDWARD BRIAN EVANS,**

     **Defendant.**


**MEMORANDUM OPINION**

Before this Court are the separate complaints by Branch Banking & Trust Co. ("BB&T")

and the United States Trustee ("UST," and jointly with BB&T, the "Plaintiffs") to deny Edward

Brian Evans's discharge.  In particular, BB&T seeks under 11 U.S.C. § 523(a)(2)(B) to except

from discharge the debt Mr. Evans owes it and in addition seeks under 11 U.S.C.

§§ 727(a)(2)(B), (a)(4)(A), and (a)(5) to deny Mr. Evans's general discharge.  Similarly, the UST

requests the Court deny Mr. Evans's general discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A),

(a)(2)(B), (a)(4)(A), (a)(4)(C), and (a)(5).  As more fully set forth below, the Court finds in favor

of the Plaintiffs.  The Court denies Mr. Evans's discharge under Bankruptcy Code sections

727(a)(2)(A), (a)(2)(B), and (a)(4)(A).[1]

## FACTUAL BACKGROUND

### a.  *Pre-Petition Background*

In 1994, Edward Brian Evans graduated from college with a bachelor's degree in

marketing.[2]  Upon graduation, Mr. Evans returned home to operate his family farm, where he

and his grandfather raised beef cattle and miniature ponies and grew hay.[3]  Mr. Evans and his

grandfather performed the majority of the farming duties for the operation until 2002, when Mr.

Evans's grandfather passed away.[4]  Subsequent to his grandfather's passing, Mr. Evans and a

few farmhands continued operating the family farm, with his grandmother, Grace Elizabeth

Evans, and his mother, Terri Street, each playing a marginal, if any, role in the day-to-day

operations of the enterprise.[5]  This division of labor continues today.

In late 2005, Mr. Evans commenced a debtor-lender relationship with BB&T to borrow

$800,000.  This loan enabled Mr. Evans to purchase a warehouse and inventory from Jack

---

[1]    "Proof of conduct satisfying any one of the sub-sections [of section 727] is enough to justify a denial of a debtor's request for a discharge"; accordingly the Court need not address the allegation raised under sections 727(a)(4)(C) or (a)(5).  *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 250 (4th Cir. 1994); *NCNB Fin. Servs., Inc. v. Shumate (In re Shumate)*, 55 B.R. 489, 495 (Bankr. W.D. Va. 1985).

[2]    Transcript at 466, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. July 16, 2015), ECF Doc. No. 73 [hereinafter *Transcript*].

[3]    *Id.* at 466–67.

[4]    *Id.*

[5]    *See id.* at 85.

Weaver.[6]  In furtherance of the transaction to purchase the warehouse and inventory from Mr. Weaver, Mr. Evans formed Graceview Properties, LLC and EID, Inc. to hold the real estate and operate the merchandise sales, respectively.[7]  EID executed a promissory note and borrowed $400,000 from Mr. Weaver for the purchase of the inventory.[8]  Mr. Evans personally guaranteed this note.[9]  The parties signed the note on April 3, 2006.[10]

In order to procure the $800,000 loan with BB&T, Mr. Evans provided the bank with a personal financial statement in October 2005.[11]  Therein, Mr. Evans represented to the bank that he had assets of over $1.2 million, including: $760,000 in real estate; $201,000 in machinery, vehicles, boats, and equipment; and nearly $150,000 in marketable securities.[12]

After he acquired the business, Mr. Evans stored the inventory, which consisted of convenience store novelty items, in the warehouse pending sale.[13]  At the time, Mr. Evans believed the items to be worth roughly $2 million wholesale.[14]  Moreover, Mr. Evans inherited

---

[6]      *Id.* at 108–09.

[7]      Am. Compl. at 3, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 3, 2015), ECF Doc. No. 44; *see also* Am. Answer at 1, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 17, 2015), ECF. Doc. No. 52.

[8]      Ex. 45, Ex. DD, Ex. EE, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. Nos. 54-46, 55-30, 55-31; *see also Transcript, supra* note 2, at 364–65.

[9]      *See* Ex. 45, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 54-46; *see also* Am. Answer at 2, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 17, 2015), ECF. Doc. No. 52; *Transcript, supra* note 2, at 342, 394.

[10]      Ex. 45, Ex. DD, Ex. EE, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. Nos. 54-46, 55-30, 55-31; *see also Transcript, supra* note 2, at 364–65.

[11]      *See* Ex. 11, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 38-8.

[12]      *Id.*

[13]      *See id.* at 446–47 (suggesting the Trustee went to the warehouse to view the inventory); *see also id.* at 394 (discussing a dispute about whether Mr. Weaver should pay rent for storing the inventory he purchased back from Mr. Evans in the warehouse).

[14]      *See id.* at 385–86.

various tenants from Mr. Weaver who were also warehousing their inventory on the property.[15]

Within a year after purchasing the warehouse, however, only one tenant remained, and that

tenant refused to sign a long-term lease for the space.[16]  In late 2012 or early 2013, the final

remaining tenant vacated the premises.[17]  In the interim, Mr. Evans's novelty item business

suffered from poor performance, posting losses every year from 2006 to 2012, at which point

Mr. Evans[18] ceased selling the inventory and terminated operations.[19]

At this point, the roof of the warehouse was in disrepair.[20]  After spending "right around

fifty thousand dollars" in an unsuccessful attempt to repair the roof himself, Mr. Evans hired a

contractor to repair the roof for $150,000, which he paid with a loan from New Peoples Bank.[21]

Mr. Evans then approached BB&T to refinance his debt to New Peoples Bank and add it to the

outstanding balance of the original debt.[22]  Once again, as a part of the loan procedure, Mr.

Evans provided BB&T with a personal financial statement, disclosing his assets and valuations

---

[15]     Am. Compl. at 3, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 3, 2015), ECF Doc. No. 44; *see also* Am. Answer at 2, *U.S. v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 17, 2015), ECF. Doc. No. 52 (acknowledging there were other tenants in the warehouse upon its purchase; all except Hutchinson and EID had moved out shortly thereafter).

[16]     *See Transcript*, *supra* note 2, at 277–80.

[17]     *See id.* at 278–80.

[18]     Generally throughout the trial, the parties referred to the inventory and the business as Mr. Evans's without distinguishing Mr. Evans from EID.  The parties agreed that EID was the owner of the inventory and that Mr. Evans was the sole owner of EID; the parties sometimes referred to Mr. Evans and EID interchangeably.  For purposes of the ruling in this case, the distinction is immaterial.

[19]     *See id.* at 331.

[20]     *Id.* at 345–46.

[21]     *Id.* at 494.

[22]     *See id.* at 25, 109, 494.

as of 2010.[23]  This 2010 financial statement displayed total assets of more than $4.9 million,[24]

including: over $2.6 million in real estate; $191,000 in machinery, vehicles, and equipment; and

over $2 million in "Other Assets," which comprised the EID inventory.[25]  Thereafter, the bank

refinanced his loan to a principal balance of $732,000 with the favorable interest rate of 4.75%.[26]

In 2011, Mr. Evans retained Russell Todd "Rusty" Jones, a certified public accountant, to

assist him in preparing his tax returns and EID's tax returns for 2010.[27]  Mr. Evans and Mr. Jones

had their first meeting on January 13, 2011, at which time Mr. Jones reviewed Mr. Evans's and

EID's prior three years' tax returns, as well as the EID business records.[28]  After reviewing the

business records, Mr. Jones questioned the marketing representations Mr. Weaver had provided

to Mr. Evans.[29]  Mr. Jones was "alarmed" by the information, and he expressed concerns with

the veracity of the marketing information.[30]

Sometime during the course of this relationship, Mr. Evans and Mr. Jones began

discussing Mr. Evans's general financial difficulties and, in particular, Mr. Evans's "asset

---

[23]     *See* Ex. 10, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 38-7.

[24]      This financial statement revealed a net worth of $3.8 million.  *Id* at 1.

[25]     *Id.* at 1, 5.  These values comport with the information included in the marketing materials Mr. Weaver provided to Mr. Evans during the sales process of the inventory.  *See Transcript*, *supra* note 2, at 367–70, 376–77. Although Mr. Evans presented the EID inventory as having a retail value of $4 million, the bank placed a wholesale value of $2 million on the inventory when calculating Mr. Evans's net worth.  *Compare* Ex. 10 at 5, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 38-7 (Mr. Evans's handwritten $4 million inventory valuation), *with id.* at 1 (final $2 million valuation), *and Transcript*, *supra* note 2, at 70 (stating BB&T reduced valuation to wholesale value).

[26]     *See Transcript*, *supra* note 2, at 23–25.

[27]     *See id.* at 329–30.

[28]     *Id.* at 330, 336.

[29]     *See id.* at 334–35.

[30]     *Id.* at 334.

exposure."[31]  Although these discussions usually revolved around how Mr. Evans could satisfy

or at least placate his creditors,[32] at some point Mr. Evans informed Mr. Jones that his

grandmother was either going to transfer, or had already transferred, her real estate to Mr. Evans

and his mother, Terri Street.[33]  Upon learning this information, Mr. Jones informed Mr. Evans

that such a transaction would not make much sense due to his precarious financial situation.[34]

According to testimony at trial, Ms. Street, who had her mother's power of attorney,

approached Robert Campbell, a local attorney, and requested he prepare "property deeds from

my mother's name to mine and from my mother's name to my [sister's]."[35]  The deed Mr.

Campbell prepared named Ms. Street and Mr. Evans as transferees of the property.[36]  The deed

was executed on December 20, 2012, and recorded on December 27, 2012.[37]  When asked why

the deed named both Mr. Evans and Ms. Street, Ms. Street testified, "[e]vidently, I requested that

[the deed] be put in mine and Brian's name.  I did not recall saying two names.  I will not deny

that I said two because that's the way it came back."[38]

---

[31]      *Id.* at 342–43 (describing conversations regarding Mr. Evans's personal liability from his guaranty and the resultant potential exposure of Mr. Evans's personal assets).

[32]      Mr. Jones also testified that during this time, "we were scrambling trying to come up with as many options as humanly possible to avoid filing bankruptcy."  *Id.* at 341.

[33]      *See id.* at 337–39.

[34]      *See id.* at 338–40 ("I told him that he was in very bad financial shape and I didn't see that as a very smart move. . . . Q: . . . [y]ou were very exclamatory in expressing this opinion.  A: It didn't make any sense.").

[35]      *Id.* at 219–20, 542–45.

[36]      *Id.* at 545–46; *see also* Ex. 19 at 1, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 54-19.

[37]      *See* Ex. 19 at 1, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 54-19.

[38]      *Transcript*, *supra* note 2, at 546.

At some point, Ms. Street returned to Mr. Campbell, who prepared another deed and called it a correction deed of gift, which Mr. Evans and Ms. Street signed on January 31, 2013, and recorded on February 8, 2013.[39]  This deed transferred Mr. Evans's interest to Ms. Street.[40]  Although Mr. Jones and Ms. Street testified they had conversations with Mr. Evans about his grandmother's bequest before the deed of correction was recorded, Mr. Evans testified that he did not know of the bequest to him and did not know that he transferred property to his mother until *after* the deed of correction was recorded.[41]  Mr. Evans did not dispute his signature on the deed of correction.[42]

EID defaulted on its payments to Mr. Weaver by late 2012.[43]  Moreover, Mr. Evans could not find any new tenants or an interested purchaser of the inventory or warehouse.[44]  Based on the default, Mr. Weaver sued EID and Mr. Evans on the contract and the guarantee.  Mr. Weaver

---

[39]     *See id.* at 547; *see also* Ex. 21 at 1, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 54-21.

[40]     Ex. 21 at 1, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 54-21.  The parties referred to this deed as a "deed of correction" throughout the hearing, and the Court will do the same in this Memorandum Opinion.  The deed of correction vested Ms. Street with sole title to the property.

[41]     *See Transcript, supra* note 2, at 500–03 (testifying that he did not know he signed a deed of gift until after reviewing the deeds at the courthouse following his 341 meeting); *id.* at 527–28 (testifying that he did not know of the transfer to him or from him until after the deed of correction was recorded).  In contrast to this testimony, Mr. Evans testified that he assumed his mother told him that the property had been deeded to him.  Mr. Evans also acknowledged that he spoke with Mr. Jones "sometime in January [2013],"—long prior to his bankruptcy 341 meeting.  During this conversation, Mr. Evans told Mr. Jones that his grandmother was deeding property to him and, "I think they are correcting the deed."  *See id.* at 527–28.  Mr. Jones testified that Mr. Evans told him about the transfer from his grandmother, declaring: "he said I think Meemaw – and I'm being literal here because that's what he refers to his grandmother – has put or is going to put some property in mine and my mom's name."  *Id.* at 338.  Ms. Street testified "at some point, I contacted [Mr. Evans] [about the transaction] because he was going to be required to sign to do the transfer."  *Id.* at 548.  Mr. Jones and Ms. Street's testimony supports the fact that Mr. Evans had knowledge of the transfer long prior to his bankruptcy 341 meeting and before such deeds were recorded.

[42]     *See id.* at 511.

[43]     *See id.* at 119–20.

[44]     *See id.* at 345–46, 492–95.

obtained a default judgment against EID in the amount of $244,000.[45]  After several months, Mr.

Weaver obtained service on Mr. Evans, who filed an answer to the lawsuit in which he did not

deny the default and in which he asserted that the inventory was worth far less than Mr. Weaver

initially indicated.[46]  Ultimately, Mr. Weaver purchased the inventory back at a UCC sale for

$35,000.[47]

In the fall of 2012, approximately 120 days prior to the maturity date of the obligation

with BB&T, Mr. Evans approached BB&T in an attempt to reach a solution regarding the

outstanding balance on his debt.[48]  BB&T offered a 12-month interest only period on the loan,

which Mr. Evans ultimately rejected.[49]  While exploring solutions with the bank, Mr. Evans

provided his third personal financial statement to BB&T on November 28, 2012.[50]  This

statement indicated total assets of over $3.7 million, including: over $2.6 million in real estate;

$191,000 in machinery, vehicles, and equipment; and $806,000 in "Other Assets," identified as

the EID inventory ($750,000) and livestock ($56,000).[51]  Although it is uncontested that he

provided the numbers contained in the document to BB&T, Mr. Evans decided not to sign and

submit this financial statement.[52]

---

[45]     *Id.* at 232.

[46]     *See id.* at 120, 232.

[47]     *Id.* at 256.

[48]     *See id.* at 38–39.  During the course of these discussions, Mr. Evans mentioned to the loan officer that "he didn't see a way out other than filing bankruptcy." *Id.* at 39.  For testimony regarding discussions between Mr. Evans and BB&T regarding the outstanding indebtedness, see *id.* at 54–55, 494–95.

[49]     *See id.* at 38–40, 495.

[50]     *See* Ex. 12, *BB&T v. Evans*, No. 14-07039 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 38-9.

[51]     *Id.* at 1, 3.  This financial statement revealed a net worth of $2.7 million.  *Id.* at 1.

[52]     *See Transcript*, *supra* note 2, at 38–39.

b.  *Pre-Bankruptcy Transactions*

After deciding not to refinance his debt with BB&T, Mr. Evans engaged in extensive pre-bankruptcy planning.  During his conversations with BB&T in the fall of 2012, Mr. Evans mentioned that "he didn't see a way out other than filing bankruptcy."[53]  It is uncontroverted that in January 2013, Mr. Evans volunteered through counsel that he would file bankruptcy once BB&T foreclosed.[54]  On February 8, 2013, Mr. Evans transferred his interest in a parcel of real estate that he had valued at $350,000 on his 2012 BB&T financial statement to his mother for $100,000.[55]  Mr. Evans did not market the property prior to transferring his interest to his mother, and she simply paid the balance of the mortgage on the property as the sole consideration.  Mr. Evans continued to use and enjoy the entire property after the transfer.[56]  Shortly thereafter, on February 27, 2015, Ms. Street purchased the remaining inventory of limited-edition "Christmas Keepers" from EID for $1,017; however, she never saw them, does not know how many she purchased, and does not know where they are stored.[57]  On April 25, 2013, Mr. Evans removed his name from a joint Bank of Marion account used in the farming

---

[53]    *Id.*  At another point in the trial, Mr. Jones testified that during this period, "candidly speaking, we were scrambling trying to come up with as many options as humanly possible to avoid filing bankruptcy."  *Id.* at 341.

[54]    *See id.* at 242–43.

[55]    *See id.* at 93–94; Ex. 32, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 38-25.  The fourth amended statement of financial affairs reports this transfer as February 26, 2013, but the deed was recorded February 8, 2013.  *See* Fourth Am. Statement of Financial Affairs at 10, *In re Evans*, No. 14-70570 (Bankr. W.D. Va. Apr. 22, 2015), ECF Doc. No. 41.

[56]    *See Transcript, supra* note 2, at 93–94.

[57]    *See id.* at 452–53, 455–58.  The Christmas Keepers were likenesses of Ms. Street's granddaughters that were packaged in an approximately eight-inch by eight-inch box.  *Id.*  Ms. Street purchased the remaining stock of Christmas Keepers because they were going to be discontinued and she wanted them to remain in the family.  *See id* at 452–53, 457–58.

operation.  This account maintained an average balance of $90,000 in the three prior months.[58]

Until this transfer, Mr. Evans had jointly owned this bank account with his grandmother for

several years.[59]

On April 23, 2013, exactly one year prior to his petition, Mr. Evans transferred to his

wife his interests in an Allianz annuity and a John Hancock life insurance policy.[60]  On

December 3, 2013,[61] a few months before filing his petition for relief, Mr. Evans cashed in a

Lincoln Financial life insurance policy for $42,764.29.[62]  Mr. Evans then paid $30,000 to BB&T

in an attempt to appease the bank and hopefully stave off any possible foreclosure attempts.[63]

On January 10, 2014, Mr. Evans surrendered an Aviva life insurance policy for the cash value of

$23,000.[64]

---

[58]     *See id.* at 124, 407–08; Ex. 40, Ex. 41, Ex. 42, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. Nos. 38-33, 38-34, 38-35 (showing an average balance of between $85,000 and $110,00 in the joint bank account between March and May 2013 before the account was closed).

[59]     *See Transcript*, *supra* note 2, at 481.

[60]     *Id.* at 194–96.

[61]     *See* Ex. 29, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 54-30 (copy of deposited check).  There was confusion regarding the date Mr. Evans deposited this check.  Mr. Evans's first amended Statement of Financial Affairs lists December 1, 2013, as the date of this transfer, and Mr. Evans testified that this transaction occurred in either late 2012 or early 2013.  *Compare* First Am. Statement of Financial Affairs at 6, *In re Evans*, No. 14-70570 (Bankr. W.D. Va. May 30, 2014), ECF Doc. No. 12, *with Transcript*, *supra* note 2, at 496.

[62]     *See* Ex. 29, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 54-30 (copy of deposited check from John Hancock); *Transcript*, *supra* note 2, at 146.  Although the check came from John Hancock, Mr. Evans named Lincoln Financial as the account processor.  *See* First Am. Statement of Financial Affairs at 6, *In re Evans*, No. 14-70570 (Bankr. W.D. Va. May 30, 2014), ECF Doc. No. 12.  A copy of this liquidated life insurance policy was not submitted into evidence by any party.  The Court will refer to this policy as the Lincoln Financial policy throughout this Memorandum Opinion.

[63]     *Transcript*, *supra* note 2, at 496.  Mr. Evans suggested this transfer was to keep BB&T satisfied, so it would not initiate foreclosure proceedings.  This ultimately allowed Mr. Evans to refrain from filing for bankruptcy for a few more months.

[64]     *Id.* at 193, 507.  Mr. Evans received a check from Aviva for $23,993.72, dated January 24, 2014.  *Id.* at 89; Ex. 31, Ex. 32, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. Nos. 54-32, 54-33.  During the hearing the parties referred to Mr. Evans receiving $23,000 for surrendering the Aviva policy.  To simplify matters, the Court will do the same throughout this Memorandum Opinion.

Mr. Evans acknowledged various other transfers.  For example, Mr. Evans sold a 1992
Chevrolet 350 work truck with a box bed to Fox Valley Trucking for an undisclosed amount.[65]
Mr. Evans acknowledged selling scrap metal,[66] disposing of a box scraper,[67] disposing of a spray
rig,[68] and delivering and selling a load of miniature ponies.[69]  It is uncontested that each of these
transactions occurred within the year prior to the bankruptcy petition, or two years at most.

### c. Post-Petition Conduct

Mr. Evans filed his petition under chapter 7 of the Bankruptcy Code on April 23, 2014,
without his required schedules, Statement of Financial Affairs, or official form B22.[70]  The Court
issued an order of deficiency on April 24, 2014,[71] and Mr. Evans filed the first iteration of his
schedules and Statement of Financial Affairs on May 7, 2014.[72]  In his initial schedules, Mr.
Evans listed two parcels of real property valued at $366,700 and personal property totaling
$267,453.01.[73]  These schedules disclosed $634,000 of assets, which is nearly $3 million *less*
than the numbers Mr. Evans provided BB&T in November 2012—only 18 months earlier.[74]

At the May 29, 2014, 341 meeting, George A. McLean, the chapter 7 trustee, requested
Mr. Evans provide him with three months of bank statements and produce deeds to his

---

[65]     *Id.* at 182.

[66]     *Id.* at 178.

[67]     *Id.* at 165.

[68]     *See id.* at 494.

[69]     *See id.* at 196–97.

[70]     *See* Ch. 7 Pet., *In re Evans*, No. 14-70570 (Bankr. W.D. Va. Apr. 23, 2014), ECF Doc. No. 1.

[71]     *See* Order of Deficiency, *In re Evans*, No. 14-70570 (Bankr. W.D. Va. Apr. 24, 2014), ECF Doc. No. 6.

[72]     *See* Balance of Schedules, *In re Evans*, No. 14-70570 (Bankr. W.D. Va. May 7, 2014), ECF Doc. No. 10.

[73]     *See id.* at 1–5.

[74]     *See id.* at 24.  Mr. Evans's net worth had plummeted; his liabilities exceeded his assets by $450,000.  *Id.*

properties.[75]  The next day, Mr. Evans filed his first amended Statement of Financial Affairs, in

which he added the transfer of property to his mother for $100,000 as well as property he held on

behalf of his grandmother, including: real estate valued at $400,000, $200,000 in farm

equipment, tractors worth $30,000, and miniature horses valued at $15,000.[76]  Mr. Evans also

disclosed a $2,500 certificate of deposit held on behalf of one of his daughters.[77]  At the same

time, Mr. Evans filed his first amended Schedule B, in which he disclosed $0 of value in his

interest in EID, a used trailer valued at $400, and the certificate of deposit held on behalf of his

daughter.[78]

A week later, on June 5, 2014, the chapter 7 trustee sent Mr. Evans's attorney, Robert

Copeland, a letter asking why Mr. Evans had not disclosed certain vehicles on his schedules,

which the trustee found during a title search—namely, a Keystone Travel Trailer, a 1992

Chevrolet S10 pickup truck, a 2011 Toyota Prius, and a 1998 BMW Z3.[79]  Shortly thereafter,

Mr. Copeland responded by letter, claiming that Mr. Evans's wife, Susan Evans, owned the

Toyota and the BMW, and defending the omissions of the trailer and Chevy S10 as simple

oversights.[80]  On June 16, 2014, Mr. Evans filed his second amended Statement of Financial

---

[75]      *Transcript*, *supra* note 2, at 518–19.

[76]      First Am. Statement of Financial Affairs at 5, 7, *In re Evans*, No. 14-70570 (Bankr. W.D. Va. May 30, 2014), ECF Doc. No. 12.

[77]      *Id.* at 7.

[78]      First Am. Sch. B at 2–4, *In re Evans*, No. 14-70570 (Bankr. W.D. Va. May 30, 2014), ECF Doc. No. 11.

[79]      *See* Ex. Q, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 36-17.

[80]      *See* Ex. R, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 36-18.  According to counsel for Mr. Evans, the BMW is titled in the name of Susan Evans and not the debtor.  The debtor admitted disclosing the BMW as belonging solely to him on his financial statement he drafted for BB&T in November 2012.  *See Transcript*, *supra* note 2, at 98–99.

Affairs to disclose his gift of the 1992 Chevy S10 to Logan Musser, the son of one of his farmhands, on May 1, 2014, and the trade-in of the camper in mid-2012 for $3,500.[81]

At the same time, Mr. Evans filed his second amended Schedule B[82] and his first amended Schedule A.[83]  On his newly amended Schedule B, Mr. Evans added the Chevy S10, to which he affixed a value of $250.[84]  On his first amended Schedule A, Mr. Evans did not add any real estate; however, he changed his interest in various tracts of land from tenancy by the entirety to joint tenancy with the right of survivorship with his wife.[85]

On July 31, 2014, the chapter 7 trustee inquired whether Mr. Copeland wished to make an offer to purchase the property of the estate from the trustee.[86]  Mr. McLean explained this was his standard practice in an asset case.[87]  On July 31, 2015, Mr. Copeland submitted a $40,000 offer to the trustee "for all of the estate's interest in Mr. Evans's property."[88]  Mr. McLean was surprised by this offer because it was for more than the disclosed value of the non-exempt assets of the estate.[89]  Accordingly, the trustee requested Mr. Copeland supplement his offer and

---

[81]      *See* First Am. Sch. A, Second Am. Sch. B, First Am. Sch. C, and Second Am. Statement of Financial Affairs at 7–18, *In re Evans*, No. 14-70570 (Bankr. W.D. Va. June 16, 2014), ECF Doc. No. 16.

[82]      *See id.* at 2–5.

[83]      *See id.* at 1.

[84]      *See Transcript, supra* note 2, at 76–77.

[85]      *See id.*

[86]      Ex. S at 1, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 36-19.

[87]      *Transcript, supra* note 2, at 426–27.

[88]      Ex. T at 1, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 36-20.

[89]      *See Transcript, supra* note 2, at 433–34.

explain the details of the offer.[90]  Mr. Copeland replied by email, eight months later on March 5,

2015,[91] with an itemized explanation of the offer.  Mr. Copeland explained Mr. Evans would pay

$24,723 in total for various items of personal property, with the remainder going to settle any

claims the trustee would have for the various undisclosed transfers.[92]  The email concludes by

affirming, "[t]his offer of settlement is intended to cover all of the assets in his bankruptcy

estate."[93]

By the end of July 2014, prior to Mr. Evans making the offer to purchase non-exempt

property of the estate, BB&T and the UST filed the adversary proceedings objecting to the

discharge of Mr. Evans's debts.[94]  On September 3, 2014, Mr. Evans disclosed in his third

amended Statement of Financial Affairs the deed of correction, which transferred the property to

his mother as sole owner.[95]

The parties conducted depositions on January 8, 2015, at which counsel for the UST

questioned Mr. Evans regarding his process for identifying the property he owned while

preparing his schedules.[96]  In response, Mr. Evans explained that he had not actually looked

around his property or his house; instead, he relied primarily upon the documentation

---

[90]      *See id.*

[91]      This date is also eight months after the Plaintiffs filed their complaints to deny discharge.

[92]      *See* Ex. U at 1, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc.
No. 36-21.  This email references an offer of $45,000 for the assets in the case; however, there is no testimony or
explanation to reconcile the original $40,000 offer.

[93]      *Id.*

[94]      *See* Compl., *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. July 22, 2014), ECF Doc. No.
1; Compl., *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. July 28, 2014), ECF Doc. No. 1.

[95]      *See* Third Am. Statement of Financial Affairs at 6, *In re Evans*, No. 14-70570 (Bankr. W.D. Va. Sept. 3,
2014), ECF Doc. No. 35.

[96]      *See* Ex. 60 at 30, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. May 8, 2015), ECF
Doc. No. 85.

representing his assets.[97]   At his deposition, Mr. Evans agreed to walk through his house and take

an actual inventory of his assets.[98]   Four months after his deposition, Mr. Evans disclosed a

Rolex watch, a class ring, five guitars (including a custom-made Henderson), a handmade

Anderson mandolin, and a cabinet cigar humidor.[99]   Although Mr. Evans agreed to walk through

his house to look for additional property in January 2015, Mr. Evans did not file his third

amended Schedule B until April 17, 2015.[100]   Although Mr. Evans owned these non-exempt

assets, he did not disclose them to the trustee when he offered to purchase estate assets from the

chapter 7 trustee.

Finally, On April 22, 2015, only two weeks prior to trial and at the same time as the

deadline to file exhibits in the case, Mr. Evans filed a fourth amended Statement of Financial

Affairs, adding Farm Credit as a financial institution to which he had issued a financial statement

over the prior two years.[101]

### d. *Adversary Proceedings and Trial*

BB&T's complaint sets forth four alternative bases for relief.   First, BB&T objects to the

dischargeability of the debt Mr. Evans owes it, based on section 523(a)(2)(B), asserting the

financial statements Mr. Evans provided the bank were fraudulent.[102]   Second, BB&T requests

the Court deny Mr. Evans's discharge under section 727(a)(2)(B) for transferring or concealing

---

[97]      *See id.*

[98]      *See Transcript, supra* note 2, at 473–74.

[99]      Third Am. Sch. B at 1–2, 5, *In re Evans*, No. 14-70570 (Bankr. W.D. Va. Apr. 17, 2015), ECF Doc. No.
40.

[100]      *See id.*

[101]      Fourth Am. Statement of Financial Affairs at 10, *In re Evans*, No. 14-70570 (Bankr. W.D. Va. Apr. 22,
2015), ECF Doc. No. 41.

[102]      *See* Compl. at 7–9, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. July 22, 2014), ECF
Doc. No. 1.

property of the estate after the petition date.[103]  Third, BB&T seeks to deny Mr. Evans's

discharge under section 727(a)(4) for false oaths made in furtherance of the alleged transfers or

concealment of property.[104]  Finally, BB&T relies on section 727(a)(5) in asserting that if the

Court finds the financial statements were accurate and Mr. Evans has not transferred or

concealed property of the estate, the Court should deny Mr. Evans's discharge for failure to

adequately explain the disposition of the assets.[105]  Mr. Evans denies all allegations in the

complaint and asserts that what seemed like fraud was merely an unfortunate series of

mistakes.[106]

The UST's complaint also seeks to have Mr. Evans's general discharge denied pursuant

to sections 727(a)(2)(B), (a)(4), and (a)(5).[107]  Additionally, the UST relies on section

727(a)(2)(A), asserting Mr. Evans fraudulently transferred or concealed property within a year

prior to the petition date.[108]  Finally, the UST asserts the Court should deny Mr. Evans's

discharge under section 727(a)(4)(C), because Mr. Evans knowingly and fraudulently attempted

to obtain property of the estate for less than what Mr. Evans knew the property to be worth.[109]

Once again, Mr. Evans denies all allegations against him.[110]

---

[103]    *See id.* at 9.

[104]    *See id.*

[105]    *See id.* at 10.

[106]    *See* Answer, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. Aug. 21, 2014), ECF Doc. No. 7.

[107]    *See generally* Am. Compl. at 16–18, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 3, 2015), ECF Doc. No. 44.

[108]    *See id.* at 15.

[109]    *See id.* at 19.

[110]    *See generally* Answer to Am. Compl., *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 17, 2015), ECF Doc. No. 52.

The Court consolidated the adversary proceedings at the parties' request. With these claims before it, the Court conducted a two-day trial at which the parties appeared and presented evidence for their respective positions. At trial, BB&T focused on the property valuations Mr. Evans provided in his personal financial statements juxtaposed with the valuations he listed on his bankruptcy schedules, as well as the documentation Mr. Evans provided BB&T generally.[111] Of particular importance to BB&T was the ultimate disposition of at least $3 million worth of assets, which apparently evaporated between November 2012, when Mr. Evans presented his third personal financial statement, and April 2014, when he petitioned for bankruptcy.[112]

Similarly, the UST questioned Mr. Evans regarding the whereabouts of the assets as well as the errors and omissions on his statements and schedules. The UST focused on the inordinate number of amendments to filings, each of which Mr. Evans filed under penalty of perjury, and elicited testimony suggesting the schedules and statements were still incorrect and/or incomplete.[113] Specifically, the UST demonstrated that Mr. Evans owned an interest in, but had yet to list on his schedules: a bale unroller, headgate and chute, hay rake, tether, numerous pieces of furniture, several washers/dryers, an ATV, a flat screen TV, hay growing in his fields, a golf cart, and a second trailer.[114] Plus, the UST demonstrated that Mr. Evans failed to adequately identify certain items on his schedules by leaving the property descriptions blank and listed questionable values for other items.[115]

---

[111]    *See generally Transcript*, *supra* note 2, at 21–36 (questioning BB&T loan officer about the financial statements Mr. Evans provided and how the bank used those documents); *id.* at 574–79 (highlighting the differences in values provided to the Court and to BB&T and other banks).

[112]    *See id.* at 574–79.

[113]    *See id. passim.*

[114]    *See id. passim.*

[115]    *See, e.g.*, *id.* at 207 (discussing a blank spot in Mr. Evans's schedules supposedly for the head gate and shoot); *id.* at 587 (discussing the blank line items in Mr. Evans's schedules).

17

The UST produced evidence[116] that Mr. Evans had yet to disclose various transactions on his Statement of Financial Affairs as well, including two payments to Bank of America within ninety days of filing his petition totaling over $10,000 (and over $22,000 within the year before filing), the transfers to his wife of his interests in the John Hancock life insurance policy and the Allianz annuity, the closing of a bank account with the Bank of Marion, the closing of a BB&T bank account, the sale of cattle, the sale of hay, the sale of a scraper blade for scrap, the sale of miniature horses, and the transfer of the Chevrolet 350 box bed pickup truck to Fox Valley.[117]

Finally, the UST sought to expose Mr. Evans's cavalier attitude toward the bankruptcy system by questioning him about the process he followed in preparing his schedules and statements in the case. To do so, the UST highlighted the fact that Mr. Evans did not actually walk through his house and take a physical inventory of his personal property as of January 2015, which was nearly eight months after filing his initial schedules and statements, six months after the complaints to deny discharge, and subsequent to several amendments to correct inaccuracies and omissions.[118] The UST suggested this nonchalant attitude demonstrated a lack of respect for the bankruptcy system and a "reckless indifference to the truth" of his statements and schedules.[119]

Conversely, Mr. Evans explained the precipitous decline in his net worth disclosed on his schedules compared to the net worth he provided to BB&T on his personal financial statements as a product of his confusion over the ownership of certain items of farm equipment and EID's

---

[116]    Much of the evidence was produced by both the UST and BB&T.

[117]    *See id. passim.*

[118]    *See id.* at 275 (Mr. Evans testifying, "I keep amending this when things are brought to my attention . . . .").

[119]    *See id.* at 584–87.

decline and ultimate demise.[120]  Mr. Evans testified that he did not realize much of the property

he included in his personal financial statement actually belonged to his grandmother until Mr.

Jones told him so sometime around July 2013.[121]  According to Mr. Evans, he had believed the

property was his because, as he testified, "I take care of the equipment.  I treat it like it was my

own."[122]  Although subject to a subpoena to testify, Mr. Evans's infirm grandmother was unable

to appear at the hearing.  Based on the grandmother's advanced age and health condition, the

Court granted a waiver of her appearance, and the parties stipulated to the admission of portions

of her deposition transcript as her testimony.[123]

Mr. Evans asserted that he was doing his best to disclose all of his property and to repay

all of his creditors.  Mr. Evans testified that he began suffering from depression around January

2013, due to his deteriorating financial situation, resulting in what he described as a "black

hole."[124]  This "black hole," Mr. Evans suggested, was the explanation for his failure to provide

complete and correct information at the time of preparing his initial schedules, but he testified

that he was doing his best to be proactive and to rectify his mistakes.[125]  As such, Mr. Evans

stressed that he amended his schedules and statements without having been asked to do so.

Upon the conclusion of the hearing, the Court took the matters under advisement.

---

[120]     *See id.* at 619–20.

[121]     *See id.* at 16, 80–81, 85, 88, 619–20.

[122]     *Id.* at 270.

[123]     *See generally* Ex. GG, *BB&T v. Evans (In re Evans)*, 14-07039 (Bankr. W.D. Va. May 4, 2015), ECF Doc.
No. 59-1.

[124]     *See Transcript, supra* note 2, at 473, 485, 621.

[125]     *See id.* at 473, 485.

**JURISDICTION**

The Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a), the delegation made to this Court by Order of Reference from the District Court entered on December 6, 1994, and Rule 3 of the Local Rules of the United States District Court for the Western District of Virginia.  This controversy is an action to deny a debtor in bankruptcy the discharge of his debts.  This is one of the most pivotal queries in a personal bankruptcy case.  This matter is a "core" bankruptcy proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I) and (J).

**LAW**

The Plaintiffs assert six unique claims upon which they object to Mr. Evans's discharge—five objecting to his general discharge and one only regarding the discharge of his debt to BB&T.  Because denying Mr. Evans's general discharge would render the question of the specific discharge of his debt to BB&T moot, the Court will first address denial of the general discharge.

   a.  *Denial of the General Discharge*

A debtor's ability to obtain a discharge of her debts is one of the most important advantages offered by the Bankruptcy Code.  "By 'free[ing]' the debtor from all debts existing at the commencement of the bankruptcy proceedings' except those exempted by statute, discharge provides the fresh start that is the hallmark of our bankruptcy system." *Jenkins v. Simpson (In re Jenkins)*, 784 F.3d 230, 234 (4th Cir. 2015) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 447 (2004)).  The right to obtain a discharge is not unconditional; the Bankruptcy Code sets forth criteria required for the discharge and curbs the grant of discharge when certain misconduct and inappropriate behavior occurs.  In a chapter 7 case, once the court determines a debtor has

committed any of the transgressions outlined in section 727(a), the court may not grant the offending debtor a discharge.  11 U.S.C. § 727(a); *see also Law v. Siegel*, 134 S. Ct. 1188, 1198 (2014) ("There is ample authority to deny the dishonest debtor a discharge." (citing 11 U.S.C. § 727(a)(2)–(6)).

When a party objects to a debtor's general discharge, the objecting party has the burden of proof.  Fed. R. Bankr. P. 4005; *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994).  Once the moving party has established the necessary criteria by a preponderance of the evidence, the burden shifts "to the debtor to provide satisfactory, explanatory evidence" in rebuttal.  *Farouki*, 14 F.3d at 249.

In the instant case, the Plaintiffs objected to Mr. Evans's general discharge, relying on: sections 727(a)(2)(A) and (a)(2)(B), alleging Mr. Evans fraudulently transferred or concealed property of the estate within one year of filing his petition or after filing his petition; section 727(a)(4)(A), alleging Mr. Evans knowingly and fraudulently made false oaths in connection with the case; section 727(a)(4)(C), asserting Mr. Evans knowingly and fraudulently attempted to obtain property of the estate for an improper amount; and section 727(a)(5), arguing Mr. Evans has not yet adequately explained the precipitous decline in the value of the assets in his bankruptcy estate.

Upon review of the evidence in the case, the Court finds the Plaintiffs have carried their burden in establishing by a preponderance of the evidence, which has not been adequately rebutted, that Mr. Evans concealed or transferred property of the estate under sections 727(a)(2)(A) and (a)(2)(B), as well as knowingly and fraudulently made false statements and

representations under oath in violation of section 727(a)(4)(A).  Accordingly, the Court will only

address these causes of action.[126]

    *b.  Section 727(a)(2)—Transfer or Concealment of Estate Property*

    Section 727(a)(2) of the Bankruptcy Code provides that

> (a)  The court shall grant the debtor a discharge, unless—
> . . .
>> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>>> (A) property of the debtor, within one year before the date of the filing of the petition; or
>>> (B) property of the estate, after the date of the filing of the petition . . . .

11 U.S.C. § 727(a)(2).  In analyzing this provision, courts within the Fourth Circuit have held

that the movant must establish four elements—(1) the transfer, removal, destruction, or

concealment of property, (2) belonging to the debtor or estate, (3) within a year of filing the

petition or after the filing of the petition, depending on the subsection, and (4) with the intent to

hinder, delay, or defraud.  *See First Union Nat'l Bank v. Golob (In re Golob)*, 252 B.R. 69, 78

(Bankr. E.D. Va. 2003); *see also Smith v. Bowen (In re Bowen)*, 498 B.R. 584, 587 (Bankr. W.D.

Va. 2013).

    Generally, for actions under section 727(a)(2), the first three elements are the easiest to

establish.  The fourth element, the debtor's intent, is the more difficult.  For purposes of section

727(a)(2), whether a debtor had the requisite intent to hinder, delay, or defraud by transferring

---

[126]     Although any one of the aforementioned claims would be independent and sufficient grounds to deny Mr. Evans's general discharge, fraudulently transferring and/or concealing assets and making false oaths are so intimately intertwined that the Court will analyze each transaction, act of concealment, and false oath as individual parts of the same larger design to defraud creditors.  *See, e.g., Wachovia Bank, N.A. v. Voccia (In re Voccia)*, 477 B.R. 625, 633 (Bankr. E.D. Va. 2011) ("The exceptions to discharge for concealment of assets under § 727(a)(2) and false oath under § 727(a)(4) usually go hand in hand because a debtor who fraudulently conceals assets in the petition has also necessarily made a false oath by signing the petition.  Thus, the court finds it unnecessary to separately analyze the evidence with respect to each section because if debtor intended to defraud creditors by omitting assets in his petition, he also filed that petition under false oath.").

property is a question of fact. *See, e.g.*, *Bane v. U.S. Trustee*, Civ. No. 7:12cv00529, 2013 WL

942415, at *2 (W.D. Va. Mar. 11, 2013), *aff'd*, 565 F. App'x 246 (4th Cir. 2014). Because direct

evidence of a debtor's intent to defraud is rare, courts consider the circumstantial evidence

surrounding the debtor's actions to infer intent. *Webb v. Isaacson (In re Isaacson)*, 478 B.R.

763, 783 (Bankr. E.D. Va. 2012) (citing *Spencer v. Hatton (In re Hatton)*, 204 B.R. 470, 475

(Bankr. E.D. Va. 1996), *aff'd*, 204 B.R. 477 (E.D. Va. 1997)). What circumstances courts

consider depend upon the prohibited actions—in this case, either a transfer or concealment.

    i.    <u>When Fraudulent Intent Inferred by the Debtor's Transfers</u>

    A bankruptcy court may infer a debtor's fraudulent intent when he transfers property by

considering the presence or absence of the badges of fraud. *Bowen*, 498 B.R. at 588.

> A transfer of property displays a badge of fraud if (1) there is a lack of
> consideration for the transfer; or (2) there is a familial relationship between the
> transacting parties; or (3) there is some retention of the property for personal use
> by the debtor; or (4) the financial condition of the debtor before and after the
> transfer is suspicious; or (5) there is an existence of a pattern of transactions after
> the onset of the debtor's financial difficulties that is suspicious based on the
> transactions or their chronology. Transfers between related parties that lack
> adequate consideration create a presumption of actual fraudulent intent. If a
> plaintiff can show a transfer between related parties that lacks adequate
> consideration, then a prima facie case for fraudulent transfer has been made and
> the burden shifts to the debtor defendant to show absence of fraudulent intent.

*U.S. Trustee v. Bane (In re Bane)*, No. 11-70118, Adv. P. No. 11-07013, slip op. at 4–5 (Bankr.

W.D. Va. June 13, 2012) (citations and footnote omitted), *aff'd*, *Bane v. U.S. Trustee*, Civ. No.

7:12cv00529, 2013 WL 942415 (W.D. Va. Mar. 11, 2013), *aff'd*, 565 F. App'x 246 (4th Cir.

2014). In order to find intent to hinder, delay, or defraud, a bankruptcy court need not find any

specific badge of fraud; "one badge [of fraud] may be sufficient." *Bowen*, 498 B.R. at 588; *see

also id.* ("[T]he presence of several badges can inescapably lead to the conclusion that the debtor

possessed an actual intent to hinder, delay, or defraud.").

ii.   When Fraudulent Intent Inferred by the Debtor's Concealment

*Black's Law Dictionary* includes as a definition of "concealment": "The act of preventing disclosure or refraining from disclosing; esp., the injurious or intentional suppression or nondisclosure of facts that one is obliged to reveal; cover-up." *Black's Law Dictionary* (10th ed. 2014). Failure to disclose an asset or transfer in the debtor's petition constitutes concealment. *See, e.g.*, *Riggs Nat'l Bank v. Andrews (In re Andrews)*, No. 92-14879-AT, 93-1012, 1996 WL 33107911, at *7 (Bankr. E.D. Va. July 2, 1996) ("Failure of a debtor to list a transfer is in itself enough to deny a debtor a discharge under § 727.").

The conventional badges of fraud do not logically apply to a debtor discreetly retaining possession of, instead of transferring, his or her interest in property. Instead, courts consider other circumstantial evidence in the case of concealment, which serve as better indicia of fraud. *See, e.g.*, *Wachovia Bank, N.A. v. Voccia (In re Voccia)*, 477 B.R. 625, 633–35 (Bankr. E.D. Va. 2011) (denying a debtor's discharge for concealing assets).

*Voccia* provides that such circumstantial evidence includes the debtor's sophistication to appreciate his responsibility to disclose his assets, representation by counsel, inordinately high number of omissions from statements, and pattern of reckless behavior toward his duties to the court. *See id.* What is more, courts have considered a debtor's continued use and enjoyment of property not disclosed on his or her schedules, as well as the debtor's desire to retain beneficial use of property throughout and after the case, as evidence of his or her intentional concealment. *See Korte v. IRS (In re Korte)*, 262 B.R. 464, 473 (B.A.P. 8th Cir. 2001). In the same way, the debtor's logical fallacies in explaining the reasons the debtor either forgot or declined to disclose the property are relevant. *See Kaye v. Hirsch (In re Hirsch)*, 14 B.R. 59, 63 (Bankr. S.D. Fla. 1981) ("The incongruity and illogic of the debtors' explanations regarding their financial affairs,

and particularly the . . . checking account, leads the court to conclude that their actions were taken with the intent to hinder, delay or defraud creditors and to conceal property . . . .").

Because the intent requirement of section 727(a)(2) is in the disjunctive ("with intent to hinder, delay, *or* defraud"), the intent need not be fraudulent and it is sufficient that the intent be to hinder or delay.  11 U.S.C. § 727(a)(2) (emphasis added); *see Cullinan Assocs., Inc. v. Clements*, 205 B.R. 377, 381 (W.D. Va. 1995) (finding bankruptcy court erred when it considered only fraudulent intent under section 727(a)(2) and failed to consider whether debtor intended to hinder or delay creditors because the statute is "plainly written in the disjunctive").  The "[i]ntent to hinder or delay may be inferred from an omission of valuable assets from a debtor's statement of affairs or schedules."  *Peoples Bank of Charles Town v. Colburn (In re Colburn)*, 145 B.R. 851, 859 (Bankr. E.D. Va. 1992).  Thus, a debtor has a "duty to disclose the assets [in his petition] so that the question may be resolved."  *Butler v. Ingle (In re Ingle)*, 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987).[127]

For these reasons, courts may infer a debtor's intent to hinder, delay, or defraud when the debtor conceals his property interests from his bankruptcy case.

c.  *Section 727(a)(4)—False Oath*

Under section 727(a)(4)(A), if a "debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account," a bankruptcy court shall not grant such debtor a discharge.  11 U.S.C. § 727(a)(4)(A).  Within the Fourth Circuit, "[i]n order to be denied a

---

[127]     As the chapter 7 trustee in this case explained, a trustee has a duty to administer assets and must rely on the schedules and statements in the case as part of the evaluation.  *Transcript*, *supra* note 2, at 421–23; *see also* 11 U.S.C. § 704.  If the schedules and statements are false and incomplete, the upshot is that a chapter 7 trustee must fish and snoop for assets.  The trustee is burdened by the time and expense to merely carry out his statutory duty.  It could hardly be more axiomatic that false or incomplete bankruptcy schedules and statements necessarily hinder the trustee and result in delays in administering the estate for the benefit of creditors.  When the debtor deliberately omits information from his schedules, disregarding his duty to disclose, it is logical to infer from his action his intent to hinder or delay his creditors.

discharge under this section, the debtor must [1] have made a statement under oath [2] which he

knew to be false, and [3] he must have made the statement willfully, [4] with intent to

defraud . . . . [And 5] [t]he false oath made by the debtor must have related to a material

matter."[128] *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987) (citations

omitted); *see also Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 352 (4th

Cir. 2007). Whether a debtor has made such a false oath is a question of fact, and the burden is

on the moving party to establish each of the aforementioned elements by a preponderance of the

evidence. *Williamson*, 828 F.2d at 251; *Farouki*, 14 F.3d at 249.

   i.   Under Oath

   Because an oath is a pledge, it is indistinguishable from a "declaration made under

penalty of perjury" as in a bankruptcy case, and thus declarations made in a bankruptcy case are

the type of statements addressed by section 727(a)(4)(A). Consequently, misrepresentations in,

or omissions from, forms filed with the court—such as the bankruptcy petition, the debtor's

schedules, the debtor's statement of financial affairs, the statement of intention, and Official

Form 22A—may constitute false oaths. *See* 28 U.S.C. § 1746; *see also Johnson-Clayton v.*

*Ferebee (In re Ferebee)*, No. 09-75200-SCS, Adv. P. No. 10-07086-SCS, 2012 WL 506740, at

*13 (Bankr. E.D. Va. Feb. 15, 2012) ("[R]epresentation in [debtor's] schedules concerning the

value of [personal property] constitutes a statement under oath for the purposes of

§ 727(a)(4)(A)."). "A false statement or an omission in the debtor's bankruptcy schedules or

statement of financial affairs can constitute a false oath." *Cummings v. U.S. Trustee (In re*

*Cummings)*, No. AZ-12-1114-DJuHl, 2012 WL 4747218, at *10 (B.A.P. 9th Cir. Oct. 3, 2012)

---

[128]      Other courts characterize these elements as "(1) debtor made a statement under oath; (2) statement was
false; (3) debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the
statement was related materially to the bankruptcy case." *Johnson-Clayton v. Ferebee (In re Ferebee)*, No. 09-
75200-SCS, Adv. P. No. 10-07086-SCS, 2012 WL 506740, at *12 (Bankr. E.D. Va. Feb. 15, 2012) (citing cases).
Thus not all courts have required the plaintiff to make the additional showing that the false oath was "willful" in
addition to "knowing." This Court concludes the Plaintiffs have shown the false oath was both knowing and willful.

(quoting *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010)); *see also U.S. Trustee*

*v. Sieber (In re Sieber)*, 489 B.R. 531, 554–56 (Bankr. D. Md. 2013).  Any misstatements,

untruths, or omissions given as sworn testimony may be considered false oaths for the purposes

of section 727(a)(4).  *See* 6 Collier on Bankruptcy § 727.04[1][c] (16th ed. rev. 2014).

      ii.   <u>Knowingly</u>

To be denied a discharge under section 727(a)(4)(A), the debtor must know that the

statement is false or that she has omitted information "with knowledge that it will create a false

impression."  *McClain v. Parker (In re Parker)*, 531 B.R. 103, 108 (Bankr. E.D.N.C. 2015).  For

purposes of this subsection, "[a] debtor acts knowingly if he or she acts deliberately and

consciously."  *Retz*, 606 F.3d at 1198 (quoting *Khalil v. Developers Sur. & Indem. Co. (In re

Khalil)*, 379 B.R. 163, 173 (B.A.P. 9th Cir. 2007)) (internal quotation marks omitted).  A

debtor's testimony that he reviewed the schedules and signed under penalty of perjury suggests a

deliberate and conscious act.  *See Cummings*, 2012 WL 4747218, at *11.  Furthermore, a record

of a flurry of activity pre-bankruptcy may suggest that the creditors' reach to assets may be on

the minds of the debtor and also suggest that actions are conscious and deliberate.  *Id.* at *12.

      iii.   <u>Willfully</u>

Like the analysis of "knowing" described above, "willful" is defined generally as

deliberate, voluntary, conscious and not inadvertent or accidental.  *See, e.g.*, *Black's Law

Dictionary* (10th ed. 2014) (defining "willful" as "[v]oluntary and intentional, but not necessarily

malicious").  Willful actions often are interpreted as intentional.  *See, e.g.*, *French*, 499 F.3d at

352 (recognizing confusion and mental impairment as distinct from intentional conduct).  With

this understanding of "willful," however, courts must determine when a debtor's failure to

provide complete and reliable information on the statements and schedules rises to the level of

willfully making a false statement.  Such an analysis is a fact intensive inquiry, and there is no

set number or value of mistakes that is inherently sufficient to conclude a debtor acted willfully.

*See McDow v. Loussedes (In re Loussedes)*, No. 09-15700-SSM, Adv. P. No. 10-1020, 2012 WL

3632814, at *3 (Bankr. E.D. Va. Sept. 9, 2010).

      iv.   <u>Intent</u>

For a court to determine that a debtor harbored an intent to hinder, delay, or defraud, it

must have either direct evidence of such intent or be presented with "specific facts and

circumstances that, in the aggregate, demonstrate a pattern of reckless disregard for the truth

sufficient to warrant an inference of fraudulent intent." *Isaacson*, 478 B.R. at 784 (citing *Hatton*,

204 B.R. at 475); *see also U.S. Trustee v. Arnold (In re Arnold)*, 369 B.R. 266, 272 (Bankr. W.D.

Va. 2007).  "Because a debtor is unlikely to testify directly that his intent was fraudulent, courts

may deduce fraudulent intent from all the facts and circumstances of a case." *Williamson*, 828

F.2d at 252 (quoting *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 754 (9th Cir.

1985)) (internal quotation marks omitted).

The Fourth Circuit has "recognized that, in evaluating a § 727(a)(4)(A) claim, 'a

determination concerning fraudulent intent depends largely upon an assessment of the credibility

and demeanor of the debtor.'" *French*, 499 F.3d at 353 (citing *Williamson*, 828 F.2d at 252).  A

debtor's contradictory or illogical testimony in explaining the false statements may suggest

fraudulent intent.  *See Cummings*, 2012 WL 4747218, at *12.  Conversely, "[e]vidence that

demonstrates confusion or a believable lack of understanding on the part of a debtor

may . . . militate against an inference of fraudulent intent." *Isaacson*, 478 B.R. at 784.

v.     Materiality

Finally, courts have found that the false statements are material if they "concern[] the existence and disposition of [the debtor's] property." *See Williamson*, 828 F.2d at 252; *Farouki*, 14 F.3d at 251 ("The omission was material because it was relevant to the debtor's business transactions, estate and assets."). There is no *de minimis* exception to the disclosure requirements under the Bankruptcy Code. *Dean v. McDow*, 299 B.R. 133, 140 (E.D. Va. 2003). The value of the asset in question, therefore, has no bearing on the inquiry into whether a statement or omission is material; "rather, a statement or omission is material if it adversely affects the ability of the trustee or creditors to fully discover the debtor's assets and financial condition." *Jalajel v. Pugsley*, No. 1:11cv163, 2011 WL 1348312, at *2 (E.D. Va. Apr. 8, 2011); *see also Daniel v. Boyd (In re Boyd)*, 347 B.R. 349, 354 (Bankr. W.D. Ark. 2006).

## ANALYSIS

Considering the record of this case, the Court determines that the Plaintiffs have carried their burden of establishing by a preponderance of the evidence that Mr. Evans fraudulently transferred and concealed property of the estate and knowingly and fraudulently made false oaths in connection with these actions. Mr. Evans's cavalier attitude toward his obligations to the Court and his creditors was ubiquitous throughout the pendency of his case. The Court concludes that Mr. Evans's conduct rises to the level of fraud and deceit. The vast number of transfers and omissions, coupled with Mr. Evans's repeated failure to disclose such transactions, his strained explanations for the transactions and failure to fully cure the defects in his schedules, as well as his lack of credible evidence in opposition, lead the Court to conclude that his actions were part of a larger design. The Court will first discuss Mr. Evans's actions transferring and concealing property and then the false oaths surrounding those transfers and omissions.

### a. Transfer or Concealment of Estate Property

The record establishes that not only was Mr. Evans a party to several transfers and transactions that removed property from the reach of his creditors, but he also failed to disclose myriad assets of his estate, even after repeatedly revising his schedules.  Based on the evidence in the record, the Court concludes that the Plaintiffs have carried their burden of establishing Mr. Evans knowingly and fraudulently transferred and concealed assets of the estate both within one year before, and in the time after, filing his petition.

### i.   Transfers

As explained above, to carry their burden under the Bankruptcy Code, the Plaintiffs must establish that Mr. Evans "with intent to hinder, delay, or defraud . . . transferred . . . property," either within a year before filing for bankruptcy or after filing his petition.  *See* 11 U.S.C. § 727(a)(2).  The only dispute is Mr. Evans's intent in making such transfers.

### 1. Transfer, Ownership, and Timing

In the time leading up to Mr. Evans's petitioning for bankruptcy, he actively shuffled property amongst himself, his family members, and certain creditors.  Mr. Evans sold a truck for scrap, sold another truck to Fox Valley Trucking, sold farm equipment for scrap, removed his name from a bank account, cashed out a Lincoln Financial life insurance policy, cashed out an Aviva annuity, transferred over $22,000 in cash to Bank of America, removed himself as the beneficiary of an Allianz annuity, and removed himself as the beneficiary of a John Hancock life insurance policy.  While any one of these transactions might be innocent in isolation, the accumulated weight of these transactions leads the Court to believe otherwise.

Mr. Evans does not dispute the existence of these transactions and transfers, nor does he dispute that each of these items, parcels, or pieces of property belonged to either himself or his

estate at the time of the transfer.  The Court finds that each of these transfers occurred within the one-year period prior to Mr. Evans petitioning for bankruptcy relief.

Mr. Evans repeatedly asserted he could not remember a specific date of transfer for many of the transactions listed above.[129]  Although the Court could not establish a particular date of transfer for some of these pieces of property, BB&T and the UST presented sufficient evidence to convince the Court all of these transactions occurred at least within a year prior to Mr. Evans's petition date.[130]  Mr. Evans's selective memory regarding when the transactions occurred and inability to produce any other evidence of such dates failed to negate the Plaintiffs' evidence.[131]

### 2.   Intent to Hinder, Delay, or Defraud

Having established Mr. Evans's ownership of the property, the existence of various transactions, and the timeframe in which the transfers occurred, the only remaining question is of Mr. Evans's intent.  Accordingly, the Court will consider the badges of fraud present in these transactions, including inadequacy of consideration, transfer to an insider, retention of a

---

[129]   At the hearing, when questioned about particular instances of transferring property and what particular pieces of property he owned, Mr. Evans repeatedly responded with, "I don't know."  *See, e.g.*, *Transcript*, *supra* note 2, at 92–93 (Q: "When did you acquire that property?  A: I don't know.  I don't know the date."); *id.* at 97 ("Q: Have you acquired any vehicles since 2010?  A: I don't think so.  Q: Have you sold any since 2010?  A: Possibly.  Q: Well which ones might you have possibly sold.  A: Well I don't know"); *id.* at 98 ("Q: What cars possibly might you have sold since 2010?  A: I don't know."); *id.* at 106 ("Q: Is that the same equipment going up in value or did you acquire some new equipment between those two points in time?  A: I don't know.  It's possible."); *id.* at 115 ("Q: Have you bought anything else other than that [head gate] since 2010?  A: I don't know."); *id.* at 123 ("Q: You admitted to me that these payments that you made to Bank of America . . . not disclosing those, that was a mistake. A: I don't know.  Was that supposed to have been disclosed?  Making payments?").

The above-referenced instances are only a few of the several dozens of instances of Mr. Evans responding to a question with some variation of "I don't know."  *See id. passim.*  Furthermore what is not reflected in the written transcript is the confident and assertive tone Mr. Evans used when declaring this ignorance of numerous facts regarding his assets.

[130]   *See generally id.* at 165–66, 482–83 (demonstrating that Mr. Evans had claimed depreciation credits on his tax returns for various pieces of property within a year prior to the filing of his bankruptcy petition).

[131]   *See In re Marcus-Rehtmeyer*, 784 F.3d 430, 438 (7th Cir. 2015) ("It would be nonsensical then, to allow a [debtor] to avoid the discovery of assets by merely stating that she could not recall precisely when she received particular assets . . . .").

beneficial or possessory interest in the property, the debtor's deteriorating financial condition,

and a pattern of suspect transactions.  The presence of these badges of fraud suggests the

debtor's intention in such a transfer was to defraud creditors and hide either the debtor's or

estate's assets.

Mr. Evans admitted his financial condition had deteriorated to the point of him being on

the brink of bankruptcy.  Indeed, Mr. Evans's attorney informed one of Mr. Weaver's attorneys,

Michael Sobey, in January 2013, that Mr. Evans intended to file for bankruptcy relief.[132]  Mr.

Evans confessed to a BB&T loan officer in late 2012 that he could not see any other way out

except bankruptcy.[133]  The Court finds that Mr. Evans was aware of his financial troubles for

more than a year prior to his petitioning for relief.

The UST pointed out in closing argument that Mr. Evans's volume of transactions

appreciably increased within the final few months preceding the filing of his petition, suggesting

a pattern of suspect behavior.[134]  What is more, other questionable behavior coincided with the

surge of transactions.  These circumstances call into question the validity of the transactions and

cast a shadow of suspicion over the entire scheme.  Mr. Evans removed himself from an account

at the Bank of Marion, which routinely held around $90,000.[135]  Although Mr. Evans had been a

---

[132]    This interaction between attorneys generated a great deal of intrigue at the trial, due to other statements Mr. Copeland made to one of Mr. Weaver's attorneys.  *See generally id.* at 233–43 (arguing about the admissibility of Mr. Sobey's testimony regarding these statements).  The Court declines to consider or discuss these controversial statements, as it does not believe they are necessary to determine the question before the Court.  What was not contested at trial, however, was that Mr. Copeland acknowledged Mr. Evans's intention to file bankruptcy in the near future "once BB&T moved for foreclosure." *See generally id.* at 241–42 (regarding Mr. Copeland objecting to the use of the testimony as an agent of Mr. Evans relating to Mr. Evans's intent to dissipate assets to defraud creditors, yet not contesting the testimony relating to Mr. Evans's intent to petition for bankruptcy).

[133]    *Transcript, supra* note 2, at 38–39.

[134]    *See id.* at 588–89, 603–06.

[135]    *See id.* at 89–90; Ex. 40, Ex. 41, Ex. 42, *BB&T v. Evans (In re Evans)*, No. 14-07039 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. Nos. 38-33, 38-34, 38-35.

co-owner of this account with his grandmother since 2004, he removed himself from the account

on April 25, 2013, less than one year prior to the filing of his petition.[136]  Mr. Evans received no

consideration for relinquishing his interest in this account.  As a result of this transfer, Mr.

Evans's elderly grandmother became the sole owner of the account.  Such a transfer for

inadequate consideration to an insider[137] while on the verge of bankruptcy suggests this

transaction was designed to shield these assets from the reach of Mr. Evans's soon-to-be-

appointed bankruptcy trustee.

      Similarly, Mr. Evans removed himself as beneficiary on an Allianz annuity, rendering his

wife the sole annuitant and shielding the payments from the reach of the bankruptcy trustee; and

Mr. Evans liquidated an Aviva annuity for $23,000 to pay Bank of America for a debt on his

wife's account.[138]  Mr. Evans received no compensation for the relinquishment of his interest in

the Allianz annuity payments, and he transferred his interest to an insider.  Mr. Evans suggested

he transferred the Allianz annuity to his wife, because "[it] was her money.  I never looked at it

as my account.  She put the money in.  She took care of it.  She put my name on it.  None of it

was my idea."[139]  Nevertheless, he needed to at least disclose this transaction on his statement of

financial affairs.  Like the above-referenced bank account, the existence of these badges of fraud

suggests the transactions were fraudulent.

      Mr. Evans used $10,000 of the Aviva annuity proceeds to pay Bank of America.  Mr.

Evans testified that his family used the remaining Aviva annuity proceeds, along with the

remaining funds from the liquidated Lincoln Financial life insurance policy, to pay for household

---

[136]      *See Transcript*, *supra* note 2, at 89–90, 481.

[137]      Mr. Evans's grandmother is an insider as defined by the Bankruptcy Code.  11 U.S.C. § 101(31)(A)(i).

[138]      *See id.* at 191–94.

[139]      *Id.* at 484–85.

expenses.[140]  Failure to disclose these transactions in a timely manner without being prompted to

do so are hallmarks of deception.

As to the remaining property transactions, the Court does not have enough information to

conclude whether they were supported by consideration, transferred to an insider, or if Mr. Evans

retained a beneficial interest therein.  Based on Mr. Evans's various transactions for less than

adequate consideration to insiders at a time when he knew his financial condition was rapidly

deteriorating, however, the Court finds such circumstances remove this pattern of transactions

from coincidental to fraudulent.[141]  Skepticism of these transactions is heightened by the fact that

Mr. Evans failed to disclose even a single one of the aforementioned transfers in his initial

statements and schedules filed with the Court, the majority of which he only disclosed after a

creditor or the trustee identified them.[142]

### 3.  *Result*

Ultimately, considering the precarious financial position in which Mr. Evans found

himself, as well as the pattern of undisclosed and suspicious transactions that emerged shortly

before he filed for bankruptcy—many of which went to insiders for inadequate consideration—

and the lack of credible evidence opposing or challenging these facts, the Court concludes that

the Plaintiffs have carried their burden in establishing by a preponderance of the evidence that

---

[140]    *See Transcript, supra* note 2, at 507.  These remaining proceeds, which Mr. Evans acquired within five months of his petition, amounted to $25,000: $13,000 from Aviva, and $12,000 that remained from Lincoln Financial after Mr. Evans paid $30,000 to BB&T.

[141]    The Court acknowledges that the sale of scrap metal, the sale of a truck to Fox Valley, and the post-petition gift of another truck to his farmhand's son, individually, might not indicate fraud; however, they serve as at least evidence of a broader pattern of fraudulent actions.  By surreptitiously engaging in each of these transactions in such close proximity to his filing for bankruptcy coupled with other fraudulent transactions, the Court finds sufficient evidence to establish at least a suspicious pattern of transfers.

[142]    On Mr. Evans's current iterations of his schedules and statement of financial affairs, he has amended them to include many of these transactions; however, none of these transfers appeared on his initial filings, and he still has not disclosed the sale of the scrap metal and junked truck from April 2014, as well as the transfers of the John Hancock life insurance policy and the Allianz annuity to his wife.

Mr. Evans harbored the requisite intent to defraud his creditors.  Accordingly, Mr. Evans violated sections 727(a)(2)(A) and (B) of the Bankruptcy Code by transferring property owned by either him or the estate within the proscribed time interval with the intent to hinder, delay, or defraud creditors.

    ii.   <u>Concealment</u>

Akin to the discussion above regarding transfers, sections 727(a)(2)(A) and (B) also prohibit a debtor's fraudulent concealment of his or her property or property of the estate.  *See* 11 U.S.C. § 727(a)(2).  The elements are the same as above.[143]  As might be apparent, concealment and false oaths generally co-exist, as a debtor's failure to provide the court with complete and proper schedules necessarily implies he has not been forthright with the court.

The conventional badges of fraud do not logically apply to a debtor retaining possession of his or her interest in property while declining to disclose that interest.  Instead, courts consider other circumstantial evidence of intent in the case of concealment, which serves as better indicia of fraud.  *See Wachovia Bank, N.A. v. Voccia (In re Voccia)*, 477 B.R. 625, 633–35 (Bankr. E.D. Va. 2011); *see also Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir. 1987) (noting the significance of multiple false oaths, the effect of false oaths in concealing assets from the bankruptcy court and the trustee, and that such concealment was advantageous to the debtor

---

[143]    A wrinkle occurs when the debtor takes steps to conceal property transferred pre-petition and outside of the one-year lookback period.  The UST has alleged that Mr. Evans's discharge may be denied because of his continuing concealment.  Within the Fourth Circuit, "[c]ontinuing concealment sufficient to bring transfers within the one year statutory period of 11 U.S.C. § 727(a)(2)(A) may be found when the debtor transfers legal title to property outside the one year period, but retains a beneficial or equitable interest in the property into the one year period.  If the debtor continues to use, enjoy, and control the property transferred as if the property remained his own, then he retains a beneficial interest in the property."  *Morrison v. Howard (In re Howard)*, 55 B.R. 580, 584 (Bankr. E.D.N.C. 1985); *see also Wieland v. Gordon (In re Gordon)*, 526 B.R. 376, 389 (B.A.P. 8th Cir. 2015) (affirming a bankruptcy court's finding that continuing concealment existed when the debtor transferred legal title to a residence and certain vehicles to his wife but retained an equitable interest with the intent to shield that property from creditors).  The Court need not address the continuing concealment as an independent ground because it finds sufficient grounds otherwise to deny Mr. Evans's discharge.  The Court, however, does recognize that Mr. Evans transferred certain property outside the look-back period and yet retains undisclosed use, enjoyment, and control over such property, much of which he holds out to the public as his own.  *See, e.g.*, *Transcript*, *supra* note 2, 93–94.

and detrimental to creditors because it prevented the trustee from exercising his powers to
recover property for the benefit of creditors).

In the case at bar, Mr. Evans failed to disclose numerous assets until compelled to do so,
either by discovery or the imminent threat thereof, and he concealed multiple transactions and
transfers of property. The Plaintiffs presented evidence of over thirty separate instances of Mr.
Evans failing to disclose either assets or property transactions throughout the pendency of his
case.[144]  The Plaintiffs identified the following property interests Mr. Evans failed to reveal upon
his first iteration of his schedules and statements[145]: various items of personal property stored at
the warehouse, his tools, his fishing equipment, his flat screen TV, at least one ATV, his interest
in a golf cart, his Rolex watch, his class ring, his handmade custom Anderson mandolin, his
handmade Henderson guitar, two Martin guitars, his Yamaha guitar, his Samik guitar, his two-
foot wide by four-foot tall cabinet humidor including an undefined number of cigars, his gun
safe, his bale unroller, his headgate and chute, cattle, hay growing in his fields, the spray rig
purchased to repair the roof of the warehouse, a tether, hay rake, and a certain amount of his tax
refund for which he gave an unreasonably low estimate.[146]  The Plaintiffs also presented
evidence that Mr. Evans failed to disclose the following transactions: the trade-in of a trailer, the
sale of a Chevrolet S10 for scrap, the gift of a Chevrolet S10 to a farmhand's son, the sale of a
Chevrolet 350 to Fox Valley, the sale of scrap metal, sale of a gravel rake that appears on the
2013 tax return but not on schedules, the removal of his name from a joint bank account at the
Bank of Marion, the closing of a bank account with BB&T, a voluntary transfer to Bank of

---

[144]      *See Transcript, supra* note 2, *passim.*

[145]      This list does not include the antique tractors Mr. Evans represented to BB&T as his property on his
financial statements, but he now claims belong to his grandmother. *See id.* at 415–16.  Similarly, the Court does not
include any of the real estate deeded to his mother but that Mr. Evans alone farms.

[146]      *See id. passim.*

America, the sale of miniature horses, the sale of cattle, the sale of hay, the cashing out of a life

insurance policy and an annuity, the removal of his name from a life insurance policy and an

annuity, the transfer of property to his mother, the recordation of a deed of correction

transferring property to his mother,[147] and his interest in rental income from a house on

Burgundy Lane.[148]  Notably, Mr. Evans either has yet to include, or only included on his most

recent schedules and statements on April 22, 2015, at least twenty-five of the aforementioned

items—a year after the petition and approximately two weeks before trial, and after the discovery

deadline.

### 1. Ownership

Looking to the elements of sections 727(a)(2)(A) and (B), the Court considers ownership

of the property.  For many of the aforementioned items, Mr. Evans does not dispute ownership;

however, for certain pieces, he does.  In particular, at the hearing Mr. Evans seemed to raise

questions as to whether he actually owned the property at his warehouse, the TV, the ATV, and

the golf cart.  Based on his testimony and his statements made to various financial institutions

and taxing authorities, it appears Mr. Evans's explanation of ownership of personal property

strains reality.

---

[147]     Although the Court does not address whether the act of signing the deed of correction constituted a sham transfer or whether the debtor continued to enjoy an interest in the property and thus engaged in continuing concealment, the Court believes Mr. Evans was not honest in explaining the circumstances surrounding this transaction.  Mr. Evans testified that he was not aware of the original transfer until after it had occurred; however, it is uncontested that he signed the original deed consummating that transfer.  *See id.* at 406.  Similarly, Mr. Jones testified that Mr. Evans had indicated to him prior to the signing of the deed of correction that his grandmother was transferring him property; obviously Mr. Evans was aware of it.  *See id.* 339–40.  Despite the questionable logic and shaky explanations provided to the Court, it need not address whether this transaction was itself fraudulent, as it is not necessary for this Memorandum Opinion.  Such strained explanations, however, raise questions regarding Mr. Evans's sincerity and intent in failing to disclose the transaction.

[148]     *See id. passim.*

First, Mr. Evans asserted that his now eleven-year-old daughter owns one of the ATVs, because she uses it.[149]  The Court is not persuaded that a child, who was at most age nine, purchased the ATV, and this argument is inconsistent with Mr. Evans's other statements. Specifically, Mr. Evans does not list the property owned by his mother and grandmother which he alone utilizes.[150]  If Mr. Evans's conception of ownership were consistent, he would assert ownership over these pieces of property as well as all of the real estate now owned by his mother or grandmother as well as the farm equipment, since he is the only one who uses these.

Furthermore, the Court notes the fact that Mr. Evans claimed depreciation deductions on his taxes for various pieces of machinery and equipment, including at least one of the ATVs he claimed he did not own.[151]  In fact, for various items Mr. Evans failed to include on his schedules, he claimed depreciation deductions on his 2013 taxes, including a box scraper, a head gate, a chute, and a gravel rake.[152]

---

[149]     *See id.* at 183, 185, 289–90.  The debtor has not been candid to the Court regarding the number of ATVs as well as the ownership thereof.  First, Mr. Evans asserted that he did not own any of four ATVs used in connection with his farming operation as well as for fun.  *See id.* at 125.  Instead, Mr. Evans suggested his eighty-five-year-old grandmother owns two ATVs, his mother owns one, and his wife owns another.  *Id.*  Later in the hearing, however, Mr. Evans's wife asserted that she owned one when they married, and Mr. Evans purchased another for his daughters.  *See id.* at 289–90.  At the same time, Mr. Evans's wife testified that she believed one of the ATVs to be Mr. Evans's property.  Mr. Evans also listed an ATV on his tax return and admitted he had been claiming depreciation on an ATV since before he and his wife were married.  *See id.* at 184.  What is more, Mr. Evans testified he purchased a yellow Suzuki ATV for his daughters as a gift.  *See id.* at 183–84.

[150]     *See, e.g.*, *id.* at 537 ("Q [to Mr. Evans]: Do you farm your grandmother's property?  A: Yes, ma'am."); *id.* at 290 ("Q [to Mrs. Evans]: How often does Brian use the golf cart?  A: Our daughter drives [the golf cart] and [Mr. Evans] drives it.  I don't go on the farm very often, so I don't know how often they drive it.  Q:  Would you say [Mr. Evans] uses it regularly? A: Yes."); *id.* at 125 ("Q [to Mr. Evans]: Now what did you say about those three ATVs? A: [T]wo [of the ATVs] were owned by my grandmother, one by my wife and one by my mother.  Q: So you don't own any ATVs? A: No, Sir.").

[151]     *See id.* at 326.

[152]     *See id.* at 164–65, 171, 208.  For both the gravel rake and the head gate and chute, Mr. Evans asserted he had either sold the item or suggested it was actually his grandmother's; however, he still listed them on his asset detail on his taxes as depreciating items, so the Court will consider them his property.  *See id.* at 171, 208.

Mr. Evans also argued the TV did not belong to him, because, although he did not contest the fact that his wife and daughters gave him the TV for Father's Day, his daughters used it more than he did.[153]   Accordingly, "[he did not] really consider it to be [his]."[154]   Once again, such a statement seems logically inconsistent to the Court.   Apparently, according to Mr. Evans's logic, if a family member also uses his property, he does not "own" it or need to disclose it in his bankruptcy, even if it were purchased specifically for him as a gift, and accepted by him.   Yet, Mr. Evans fails to explain why under this logic, he does not own property or need to disclose property that *he* uses but happens to belong to another family member.

Further implausible is Mr. Evans's explanation for failing to disclose the golf cart that was a wedding gift.   According to Mr. Evans's testimony at trial, because he and his wife owned it jointly, he did not have to disclose the asset, and he was "supposed to put what [was] solely [his]."[155]   Again, disregarding the fact that Mr. Evans had previously disclosed property owned in tenancy by the entireties with his wife on his initial schedules,[156] it is uncontested that he used the golf cart far more than his wife did, so his explanation is entirely inconsistent with his explanation regarding the TV or the ATV.

Mr. Evans failed to disclose the income from or the full value of the hay and the sale of cattle[157] in his bankruptcy schedules and statements.[158]   His explanation was simply "we didn't include the cattle on the assets for the bankruptcy."[159]

---

[153]      *See id.* at 507–08.

[154]      *Id.* at 508.

[155]      *Id.* at 276.

[156]      A characterization he later changed to joint tenancy with right of survivorship.   *See* First Am. Sch. A at 1, *In re Evans*, No. 14-70570 (Bankr. W.D. Va. June 16, 2014), ECF Doc. No. 16.

[157]      The Plaintiffs provided evidence of sale proceeds to Mr. Evans from hay for $5,600 and cattle for $18,000, as well as evidence of the sale of horses, all of which the debtor neglected to report in his bankruptcy.   *See* Ex. 12 (2013 tax return), Ex. 13, Ex. 35 (deposit of income to Mr. Evans from sale of cattle), *U.S. Trustee v. Evans (In re*

Finally, Mr. Evans claimed that he did not believe he needed to disclose the property he had in his warehouse, because he felt he had abandoned it.[160]  At the hearing, Mr. Evans asked, "if I just left it, is it still my property?"[161]  Mr. Evans admitted that he alone had access to the secured enclosure in which the property is stored and provided no support for his defense that he abandoned the property merely by leaving it in the warehouse.[162]  The Court is not persuaded with Mr. Evans's inconsistent and logically questionable explanations for why he did not disclose all of his property.  The Court concludes that the Plaintiffs carried their burden in establishing that Mr. Evans owned all of it.

### 2. Concealment and Timing

Mr. Evans owned certain property at the time of the filing of his petition which he did not disclose.  This property became property of the estate, but Mr. Evans failed to subsequently disclose it and bring it to the chapter 7 trustee's attention despite amending his schedules multiple times.  *See* 11 U.S.C. § 541(a).  By concealing the property of the estate post-petition, Mr. Evans thus meets the temporal requirements of section 727(a)(2)(B).

---

*Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. Nos. 54-12, 54-13, 54-36; *see also Transcript*, *supra* note 2, at 174–76, 197–201.

[158]    *See* Ex. 9, Ex. 10, Ex. 11, Ex. 12, Ex. 13 (showing depreciation for cattle and income from sale of cattle and sale of hay on tax returns), *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. Nos. 54-9, 54-10, 54-11, 54-12, 54-13.

[159]    *Transcript*, *supra* note 2, at 115.

[160]    *See id.* at 176–77.

[161]    *Id.* at 177.

[162]    *See Talley v. Drumheller*, 130 S.E. 385, 449–50 (Va. 1925) ("Abandonment of tangible personal property means that the owner thereof voluntarily relinquishes possession thereof with the intention of terminating his ownership and with no intention of vesting title in another . . . . But mere lapse of time and nonuser, unaccompanied by other evidence of intention, are generally not sufficient to constitute an abandonment.").

### 3.  Intent to Hinder, Delay, or Defraud

The Court turns to whether Mr. Evans harbored the requisite intent to hinder, delay, or

defraud his creditors by concealing assets from his bankruptcy case.  As in *Voccia*, Mr. Evans is

an intelligent man with a college degree, and he was represented by counsel throughout the

pendency of his case, as well as for over a year prior to filing his petition.[163]  Based on these

facts, Mr. Evans was more than capable of comprehending his duties and responsibilities to the

Court, of which his attorney and the trustee routinely reminded him.[164]  Nevertheless, Mr. Evans

has amended his filings with the Court seven distinct times,[165] and yet, his schedules remain

deficient.  Indeed, even after myriad amendments and updates to his statements and schedules,

Mr. Evans admitted that he did not even walk through his residence and actually look for items

of property he might have missed as of almost nine months after filing his petition and more than

six months after the complaints objecting to discharge were filed.[166]  Moreover, all of the assets

that Mr. Evans concealed are non-exempt assets, and Mr. Evans was aware that his chapter 7

trustee would liquidate non-exempt assets.[167]

Mr. Evans's actions, taken as a whole, indicate an improper purpose.  At trial, Mr. Evans

did not dispute his failure to include many of the items on his schedules.  Mr. Evans's only

---

[163]    *See Wachovia Bank, N.A. v. Voccia (In re Voccia)*, 477 B.R. 625, 633–35 (Bankr. E.D. Va. 2011).

[164]    *See, e.g.*, *Transcript*, *supra* note 2, at 122 ("Q: An so you understand that's your duty in this case [to tell the Court everything you owned of any kind whatsoever]?  A: Yes."); *id.* at 163 ("Q: At this point in time, I mean it's been thoroughly impressed upon you the need to have accurate schedules; correct?  A: Yes."); *id.* at 275 ("Q: Do you feel like you had an obligation to look around and see with your eyes when you were filling out these schedules?  A: Possibly.").

[165]    In total, Mr. Evans amended his Statement of Financial Affairs four times, Schedule B three times, Schedule C two times, and Schedule A once.  *See In re Evans*, No. 14-70570 (Bankr. W.D. Va. Apr. 23, 2014), ECF Doc. Nos. 11, 12, 16, 31, 35, 40, 41 (amended schedules).

[166]    *See Transcript*, *supra* note 2, at 473–74.

[167]    *See id.* at 509–15 (Mr. Evans's testimony regarding his relationship with the trustee and knowledge of the duties of the trustee); *id.* at 523–24 (Mr. Evans's testimony firmly acknowledging his desire to keep certain property including musical instruments).

explanation for his failure to include these omitted items and transactions was his unsubstantiated testimony that he was suffering from depression and had been in what he described as a "black hole" at the time he filed his original schedules.[168]  While the Court sympathizes with Mr. Evans's struggles, such explanation even if it had been substantiated by objective support, is not consistent with his testimony regarding his efforts to amend his schedules and his testimony regarding his conscious decision to not disclose property used by his children or owned jointly with his wife.  Mr. Evans's defense is also at odds with his confident and defiant reporting of, for example, the precise amount spent to repair his roof, amounts paid to Mr. Weaver,[169] and his clear memory of the particular non-exempt assets the chapter 7 trustee requested for inspection.  Furthermore, Mr. Evans failed to provide legal support for the proposition that depression is a defense to a fraudulent transfer or an exception to a debtor's responsibility to disclose his assets and to truthfully and completely answer questions regarding his financial affairs.  As Mr. McLean explained, a bankruptcy trustee must rely on the debtor's schedules and statements, and without complete information, a trustee cannot perform his statutory duties.[170]  Mr. Evans made no showing that a debtor's depression provides an exception to a trustee's statutory duties.[171]

Regarding the articles of property for which Mr. Evans provided the Court with an excuse, his inconsistent and illogical reasoning does not convince the Court of his sincerity.

---

[168]     *Id.* at 473, 485.

[169]     For example, Mr. Evans reported that he paid Mr. Weaver "from my pocket" the amount of $2,900 each month until April 2013.  *See Transcript*, *supra* note 2, at 496–97.

[170]     *See id.* at 420–23.

[171]     Furthermore, all of the property Mr. Evans failed to disclose to the trustee would have been non-exempt assets that Mr. McLean would have liquidated and disbursed to creditors.  Although many of them were not especially valuable, taken together, the failure to disclose deprived the creditors of substantial potential recovery.

Indeed, to the contrary, courts consider such inconsistent and contrary explanations as evidence of a debtor's intent to conceal property from the reach of creditors. *See Kaye v. Hirsch (In re Hirsch)*, 14 B.R. 59, 63 (Bankr. S.D. Fla. 1981) ("The incongruity and illogic of the debtors' explanations regarding their financial affairs, and particularly the . . . checking account, leads the court to conclude that their actions were taken with the intent to hinder, delay or defraud creditors and to conceal property . . . ."). As an educated, sophisticated individual who operates a large-scale farming operation, the Court is unpersuaded that Mr. Evans sincerely maintains such an incongruent and crude conception of legal ownership.

Accordingly, the Court holds that Mr. Evans demonstrated the actual intent to conceal assets in order to hinder, delay, or defraud his creditors.

### 4.  Result

Based on the foregoing analysis, the Court concludes that the Plaintiffs have demonstrated by a preponderance of the evidence that Mr. Evans violated sections 727(a)(2)(A) and (a)(2)(B) by concealing property from his creditors with the intent to hinder, delay, or defraud them. Mr. Evans failed to disclose myriad assets and transfers,[172] yet he is sophisticated enough to understand his duties to the Court and his creditors. Even after multiple attempts to bring his filings in his case current, they remain deficient as of today. Without complete schedules, the creditors and trustee do not have sufficient information to evaluate their position

---

[172]    Not discussed here are questions the Court has about Mr. Evans's potential concealment of income. Although unnecessary to analyze in this opinion because the Court has denied his discharge, the Court will highlight some inconsistencies in Mr. Evans's testimony regarding his income. Mr. Evans listed his income as $2,900 per month, reported *gross* income of $34,800 per year for the previous two years, and disclosed a bank account with a balance of less than $2,000. *See* Balance of Schedules at 2, 18, *In re Evans*, No. 14-70570 (Bankr. W.D. Va. May 7, 2014), ECF Doc. No. 10. Nevertheless, Mr. Evans testified that "[he] bought [a] spray right and spent right around $50,000" to fix the roof of the warehouse. *See Transcript*, *supra* note 2, at 494. Similarly, Mr. Evans admitted that after Hutchinson vacated the premises, Mr. Evans paid Mr. Weaver on his note "out of [his] pocket" or "my personal checking or savings or Farm Credit Account" each month, until April 2013, $2,900 per month. *See id.* at 532–34. His wife testified that he paid her monthly between $2,500 and $4,500 for "his fair share" of household expenses and between $1,500 and $2,500 per month for the credit card. *Id.* at 291–93. Thus, the Court is skeptical of the income Mr. Evans provided the Court in his schedules.

in the bankruptcy; all the more they are thwarted from exercising their rights and duties.  The Court concludes the Plaintiffs have carried their burden under section 727(a)(2).

    *b.  False Oath*

    Finally, and related to Mr. Evans's transfer and concealment of assets, the Court concludes that the Plaintiffs have established by a preponderance of the evidence that Mr. Evans knowingly and fraudulently made false oaths throughout the case, including omissions, inconsistencies, and outright untruths.  Section 727(a)(4)(A) of the Bankruptcy Code authorizes a court to deny a debtor's discharge if he or she "knowingly or fraudulently, in or in connection with the case . . . made a false oath or account."  *See* 11. U.S.C. § 727(a)(4)(A).

    Mr. Evans's actions transferring and concealing assets of his estate were often accompanied by omissions from and/or false information on his statements and schedules.  Mr. Evans on several occasions filed sworn statements with the Court relating to the property in his estate, which were either incomplete or inaccurate.[173]  *See Dean v. McDow*, 299 B.R. 133, 140 (E.D. Va. 2003) (noting that there is no *de minimis* exception to the Bankruptcy Code's disclosure requirements, and, thus, any omission of a single asset from the schedules is a material one, regardless of the value of the asset).

    Considering the elements of section 727(a)(4)(A), Mr. Evans filed his statements and schedules under penalty of perjury, and he testified at trial under oath.  Thus, any misstatements or omissions contained therein would satisfy the requirement that the misstatement be "in connection with the case."  Any false oaths made in the furtherance of his plot to transfer and conceal property of his estate would necessarily be willful and knowing misstatements.[174]  Such

---

[173]    *See Transcript*, *supra* note 2, *passim*.

[174]    Because Mr. Evans intentionally sought to transfer and conceal assets of the estate fraudulently, the nondisclosure of such assets could not have been done mistakenly or unconsciously.  One cannot innocently or

fraudulent actions could not have been committed by accident or inadvertently. As shown above, Mr. Evans made fraudulent transfers and concealed assets deliberately with knowledge and intent. Likewise, Mr. Evans made declarations in his bankruptcy to hide these transfers and assets. The Court finds Mr. Evans made these declarations deliberately and voluntarily, and therefore knowingly and willfully.

Next, Mr. Evans's actions establish that he harbored the requisite intent to make such false oaths. As mentioned above, a movant may establish the debtor's intent to defraud in the false oath context by establishing the debtor at least acted with a "reckless indifference to the truth." *See Webb v. Isaacson (In re Isaacson)*, 478 B.R. 763, 783 (Bankr. E.D. Va. 2012) (citing *Spencer v. Hatton (In re Hatton)*, 204 B.R. 470, 475 (Bankr. E.D. Va. 1996), *aff'd*, 204 B.R. 477 (E.D. Va. 1997)). Based on Mr. Evans's numerous misstatements and omissions, multiple ineffective amendments to his schedules, and generally cavalier and sometimes hostile attitude toward the bankruptcy process, the Court holds that Mr. Evans harbored at least a reckless indifference to the truth. This is underscored by the fact that Mr. Evans admitted he never actually *looked* for property he owned as late as eight months after filing his petition.[175]

Mr. Evans's insufficient effort and indifference to how his actions impacted creditors was evident in his offer to purchase the assets of the estate from the chapter 7 trustee. At the time Mr. Copeland sent the explanation of the offer amount to Mr. McLean on March 5, 2015, Mr. Copeland and Mr. Evans were aware of numerous assets Mr. Evans had yet to disclose to Mr. McLean.[176] Mr. Copeland declined to inform Mr. McLean of these assets and instead made an

---

mistakenly defraud another. *See, e.g.*, 11 U.S.C. § 727(a)(2) (requiring the movant to prove the debtor harbored the actual intent to defraud to carry its burden).

[175]    *See Transcript*, *supra* note 2, at 473–74.

[176]    As late as March 2015, when Mr. Evans's attorney provided an explanation of his offer to purchase the property of the estate, Mr. Evans had failed to disclose his Rolex watch, his five guitars, his mandolin, his fork lift,

offer "intended to cover all of the assets in [Mr. Evans's] bankruptcy estate."[177]  If Mr. Evans

and his attorney were not so recklessly indifferent to the importance of full and complete

disclosure, they should have revealed all assets, especially any newly detected assets.

In an example of his defiance, Mr. Evans testified that when he was supposed to turn over

his non-exempt guitars and Rolex, he did not produce the mandolin and would not let the trustee

even see the mandolin, because the trustee did not expressly state that he wanted the mandolin.

Such a resistance to comply with the requirements and requests of the trustee and the Court seem

to be ubiquitous in Mr. Evans's actions in this case and indicate to the Court a pattern of defiance

toward his duty to be candid and cooperative with the Court.

The Plaintiffs have carried their burden.  As discussed above at length, Mr. Evans's

actions and omissions were pervasive throughout the case, which served to protect his assets

from the reach of creditors and the trustee.  In connection with these actions, Mr. Evans made

numerous false representations to the Court regarding these transactions, both in his statements

and schedules filed under the penalty of perjury and while testifying at the hearing under oath.

The Court holds that the Plaintiffs have carried their burden in establishing by a preponderance

of the evidence that Mr. Evans knowingly and fraudulently made false oaths to the Court in

violation of 11 U.S.C. § 727(a)(4)(A).

**CONCLUSION**

The Court rules that BB&T and the UST have established by a preponderance of the

evidence that Mr. Evans violated sections 727(a)(2)(A), (a)(2)(B), and (a)(4)(A) of the

Bankruptcy Code.  Mr. Evans failed to provide any credible evidence sufficient to call into

---

his paint sprayer, his golf cart, his cabinet cigar humidor and cigars, his gun safe, and his cattle working equipment, among other assets.  *See* Ex. 63, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 54-63; *see generally Transcript*, *supra* note 2, at 125–35.

[177]    *See* Ex. U at 1, *U.S. Trustee v. Evans (In re Evans)*, No. 14-07040 (Bankr. W.D. Va. Apr. 23, 2015), ECF Doc. No. 55-21.

question the overwhelming circumstantial evidence of Mr. Evans's intentional transfers to

hinder, delay, or defraud creditors, deliberate concealment of property of the estate, and knowing

and fraudulent false oaths in connection with this case.  Mr. Evans's unsupported assertion of

depression causing forgetfulness is at odds with his confident and defiant reporting of, for

example, the precise amount spent to repair his roof, amounts paid to Mr. Weaver, and his clear

memory of the particular non-exempt assets his chapter 7 trustee requested for inspection, as

well as his admitted conscious omission of property that he did not frequently "use" or that he

attributed as belonging to other family members.  *See generally In re Marcus-Rehtmeyer*, 784

F.3d 430 (7th Cir. 2015) (admonishing courts to employ basic logic and reasoning when

considering a debtor's irrational and unreasonable explanations for failures to disclose assets).

Accordingly, Mr. Evans's general discharge is **DENIED**.

The Court will contemporaneously issue an order consistent with the findings and ruling

of this opinion.

Date Entered:  September 25, 2015

Rebecca B. Connelly
United States Bankruptcy Judge